# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEPHEN F. MCCLOSKEY** | : | **CIVIL ACTION** |
| | : | |
| v. | : | **NO. 18-2572** |
| | : | |
| **NANCY A. BERRYHILL** | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                                       **December 28, 2018**

Persons seeking supplemental security income benefits based on epilepsy and anxiety must present the Social Security administrative law judge with the evidence necessary to make specific findings of disability warranting benefits. We study a challenged decision from an administrative law judge to ensure due process, he addressed all the claimant's arguments and evidence, and his findings are based on substantial evidence. We do not second-guess the administrative law judge's detailed findings when he describes the weight afforded to doctors' opinions and otherwise addresses the hypotheticals posed to vocational experts. After careful review of an administrative law judge's decision denying benefits to a person facing epilepsy and anxiety from time to time with intermittent compliance with taking medicine, and possible available jobs described by the vocational expert based on the evidence, we deny the claimant's request to reverse or remand the administrative law judge's decision.

## I.   Background

Stephen McCloskey asks we reverse the Social Security Administration Commissioner's May 25, 2018 decision denying his request for supplemental security income benefits. Mr. McCloskey, 59 years old when he filed his request for benefits on September 4, 2015, suffers from

epilepsy and anxiety. Mr. McCloskey's epilepsy causes seizures. He has not worked since 2008, when he worked in a warehouse. The Social Security Administration denied Mr. McCloskey's claim at the initial level of review, and he requested a hearing before an Administrative Law Judge (ALJ).[1] ALJ Edward Thompson held a merits hearing on February 23, 2018. Mr. Thompson's present counsel also represented him at the merits hearing.

### A.     Mr. McCloskey testifies before Administrative Law Judge Thompson.

As he testified on February 23, 2018, Mr. McCloskey is now 61 years old, divorced, and lives alone.[2] He began experiencing epileptic seizures in July 2008.[3] He became unconscious during his first seizure and landed on the floor not knowing how he got there.[4] He suffers from petite mal and grand mal seizures.[5] He experiences petite mal seizures "almost daily" and grand mal seizures every "24 to 36 hours."[6] Mr. McCloskey feels like he is "coming out of a dream sequence" during his petite mal seizures.[7] Mr. McCloskey suffered injuries from falling down during grand mal seizures. He testified he suffered multiple facial fractures, hematomas, and an injury to his left eye.[8] After one seizure, Mr. McCloskey fell and hit his face against a fire hydrant.[9] He also suffered concussions from falling after seizures.[10]

Mr. McCloskey testified the seizures affect his ability to work. While working at a casino warehouse, he drove a truck into an "overhead structure."[11] Mr. McCloskey testified he uses a cane to "keep [him] from falling in a certain direction" when a seizure occurs.[12] He once had a seizure on a transit bus and was robbed.[13] Mr. McCloskey takes Vimpat for his epilepsy but testified the drug has "had no effect so far."[14] He used to have "an excellent memory" but now "[i]t's not what it used to be."[15]

Mr. McCloskey testified he took Dilatin to treat his epilepsy but stopped taking the drug in August 2015.[16] After he stopped taking Dilatin, he began taking Gabapentin but stopped in 2016

2

because it "was not working."[17] He next took Vimpat starting in March 2017 but stopped using the drug in January 2018.[18]

Mr. McCloskey also suffers from headaches and takes over-the-counter medicine to treat the headaches.[19] Mr. McCloskey also suffers from anxiety and takes Klonopin to treat it.[20]

Mr. McCloskey's counsel failed to identify an acceptable medical, treating source for Mr. McCloskey.[21] He also failed to identify a treating source who could offer the ALJ an opinion on Mr. McCloskey's functional abilities or limitations.[22] Mr. McCloskey's counsel identified only treating physicians "who defined the problem and the medical condition that he suffers from."[23]

### B. Vocational Expert King testifies at the February 23, 2018 hearing.

Vocational Expert Clifton King testified at the merits hearing. ALJ Thompson posed a hypothetical to Vocational Expert King based on the residual functional capacity he found:

> "Let's begin with no exertional limitations. So the individual exertionally, hypothetically, can do everything at all exertional levels, that would include sedentary, light, medium, heavy, and very heavy. . . . We do have postural limitations, some are limited, some are not limited. The one that is limited concerns climbing ladders, ropes, and scaffolds. Never climb a ladder, rope, or scaffold. I want to repeat that. Never climb a ladder, rope, or scaffold. You may be wondering about the six remaining postures? Those are not limited. The individual can do those for all eight hours of the eight-hour work day, according to this doctor. So that would be unlimited climbing of ramps and stairs, unlimited balancing, unlimited stooping, unlimited kneeling, unlimited crouching, unlimited crawling. All six of those are not limited, can do those all eight hours of the eight-hour work day. . . .
>
> We do have environmental limitations. And there are several of them. Lucky for us, they're all under the same level of avoidance. It's avoid concentrated exposure, let me repeat that. Avoid concentrated exposure, and that's for several environmental matters. Avoid concentrated exposure to extreme cold, avoid concentrated exposure to wetness, avoid concentrated exposure to noise, avoid concentrated exposure to vibrations. . . . Avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation. . . . The final one, avoid concentrated exposure to hazards such as dangerous moving machinery and unprotected heights."[24]

3

In response to ALJ Thompson's hypothetical, Vocational Expert King offered three positions:

> I would offer the job of . . . [d]ietary aide, 319.677-014. It is medium, unskilled, SVP of 2. National numbers between 30 and 40,000. The job of transporter, patient. The DOT code is 399.677-014 and this is not driving a person, this is just within the hospital setting, medical center, medium, SVP of 2, unskilled. National numbers, no more than 10,000. . . . On the job of sandwich maker, 317.664-010. It is medium, unskilled, SVP of 2. . . . I got approximately 55,000.[25]

Mr. McCloskey's counsel cross examined Vocational Expert King: "And in taking into consideration his honor's hypothetical, did you take into consideration whether or not someone with a seizure disorder would be able to perform and of those occupations that identified?" Vocational Expert King answered "[i]n my opinion, no . . . [they] [w]ould not be able to."[26]

### C. The Commissioner reviewed Mr. McCloskey's disability claims under the established five-step sequential analysis.

A claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[27] The Commissioner must follow a five-step analysis to determine whether a claimant has a disability as defined under federal law.[28] At step one, the Commissioner determines "whether the claimant is engaged in substantial gainful activity."[29] Engagement in such activity precludes an award of benefits. If, however, the claimant is not engaged in substantial gainful activity, the Commissioner moves to step two and evaluates the "severity of the claimant's impairment(s)."[30] A claimant's failure to show his or her impairments are "severe" precludes an award of benefits.[31] If the claimant proves his or her impairments are severe, the Commissioner proceeds to step three and "determines whether the impairment is equivalent to one of a number of listed impairments that . . . are so severe as to preclude substantial gainful activity."[32] If the

4

Commissioner determines "the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled."[33]

If, on the other hand, "the applicant has a severe impairment that does not meet or equal an impairment in the Listings, the ALJ must determine at step four whether the applicant has the Residual Functioning Capacity ('RFC') to perform her former relevant work."[34] "[R]esidual functional capacity" is simply "the bureaucratic term for ability to work."[35] If the claimant satisfies step four and shows he or she does not have the ability to perform former relevant work, "the burden then shifts to the Commissioner at step five to show that other jobs exist in significant numbers in the national economy that the claimant could perform."[36] "[I]f the Commissioner cannot demonstrate that the applicant has the [residual functional capacity] to perform other existing work[,] the ALJ must find the applicant to be disabled."[37]

### D.  ALJ Thompson concludes Mr. McCloskey is not disabled.

In his March 20, 2018 decision, ALJ Thompson denied Mr. McCloskey's request for supplemental security income. ALJ Thompson concluded at step one Mr. McCloskey "has not engaged in substantial gainful activity since September 4, 2015, the application date[.]"[38] At step two, ALJ Thompson found Mr. McCloskey has the "severe impairment" of epilepsy.[39] ALJ Thompson concluded at step three although Mr. McCloskey's epilepsy is "severe," it does not "meet[] or medically equal[] the severity" of a listed impairment.[40] At step four, ALJ Thompson found Mr. McCloskey has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations:

> Never climb a ladder, rope, or scaffold; the claimant's abilities to climb ramps and stairs is unlimited; unlimited balancing; unlimited stooping; unlimited kneeling; unlimited crouching; unlimited crawling; the claimant must avoid concentrated exposure to extreme cold; the claimant must avoid concentrated exposure to wetness; the claimant must avoid concentrated exposure to noise; the claimant must avoid concentrated exposure to vibration; the claimant must avoid concentrated

5

exposure to fumes, odors, dusts, gases, and poor ventilation; and the claimant must avoid concentrated exposure to hazards, such as dangerous moving machinery and unprotected heights. The claimant has no manipulative, visual, or communicative limitations. The claimant's ability to be expose to extreme heat is unlimited. The claimant's ability to be exposed to humidity is unlimited. The claimant has no other physical limitations or restrictions. The claimant has no mental limitations or restrictions.[41]

ALJ Thompson found "[t]he medical evidence of record shows the claimant has restrictions, but less limitation than alleged[.]"[42] ALJ Thompson acknowledged Mr. McCloskey's testimony concerning his seizures and his fear of falling after a seizure.[43] He also acknowledged Mr. McCloskey wrote in submissions to the Administration he engaged in normal activities, including "light housecleaning, washing laundry, doing minor household repairs, preparing simple foods, doing yard work such as raking leaves, shopping in stores once a week for about two hours, and walking for exercise."[44]

ALJ Thompson gave great weight to the medical opinion of Dr. Catherine Smith, M.D., the State Agency medical consultant.[45] Dr. Smith reviewed Mr. McCloskey's medical history and determined it does not substantiate his statements about the intensity and functionally limiting effects of his symptoms.[46] Dr. Smith found Mr. McCloskey "partially credible."[47] ALJ Thompson found while Mr. McCloskey could control his seizures with medication, the record shows non-compliance with his medication regimen.[48] ALJ Thompson also found medical evidence in the record shows Mr. McCloskey experienced fewer seizure than he claimed at the hearing.[49]

In determining Mr. McCloskey's residual functional capacity, ALJ Thompson considered medical evidence from treating physicians and cited the evidence in his decision.[50] He considered records from Crozier Medical Center showing (1) Mr. McCloskey's was "non-compliant" with his seizure medication Dilatin and (2) the medical staff explained to Mr. McCloskey the importance of filling his prescriptions.[51]

6

ALJ Thompson considered Mr. McCloskey's medical records from George W. Hill Correctional Facility during his incarceration from 2014 to August 2015. On April 7, 2014, a medical provider wrote Mr. McCloskey has a history of seizures occurring "once in a while" with the last seizure occurring September 2013.[52] On May 8, 2014, a treating physician wrote Mr. McCloskey "reports a 6 year history of seizures . . . has been on different doses of Dilatin (200mg and 600mg a day) for the past 6 years. . . . averages 6 seizures per year, last seizure was in 11/13."[53] ALJ Thompson considered a June 23, 2014 laboratory test showing Mr. McCloskey had sub-therapeutic Dilatin levels.[54] He considered records from July 2014 showing Mr. McCloskey "has been off Dilatin for a month and seizure free. Has refused meds."[55] On July 22, 2014, a treating physician wrote Mr. McCloskey "signed a refusal form for seizure medication and seizure related treatment. [Mr. McCloskey] had requested to be taken off seizure medication because he didn't think he needed to be on meds anymore. Dr. Pierce discussed with [Mr. McCloskey] the risks and consequences of refusing the recommended treatment."[56] ALJ Thompson also considered a September 2014 visit during which Mr. McCloskey said he stopped taking Dilatin and his last seizure occurred in 2013.[57] ALJ Thompson considered a record from an October 24, 2014 visit with the medical staff during which he reported no seizures since his previous visit on October 16.[58] He considered records from a April 2, 2015 physical, in which the treating physician wrote Mr. McCloskey has a history of seizures "but no meds," despite his history of taking Dilatin.[59]

ALJ Thompson also considered records from physician Dr. Alexander Bunt, Jr., D.O., who treated Mr. McCloskey following his release from prison in August 2015.[60] Dr. Bunt reported on October 19, 2015, Mr. McCloskey "is having seizures again . . . states he has them for ten years . . . he was taking dilatin."[61] Dr. Bunt's laboratory tests show Mr. McCloskey's Dilatin level as less than 0.6, with the intended therapeutic range between 6.0 and 14.0.[62] Dr. Bunt also reported Mr.

7

McCloskey "has been home from prison in [D]elaware [C]ounty [since] September and has had one seizure since he has been."[63] On April 5, 2016, Dr. Bunt reported Mr. McCloskey's "[e]pilepsy is getting better" and noted Mr. McCloskey was taking Keppra for his epilepsy.[64] ALJ Thompson also considered the medical opinions of treating physician Dr. Kesha Wilford. He cited records from April 26, 2016, in which Dr. Wilford wrote Mr. McCloskey took Keppra for his seizures and his condition improved.[65]

At step four, ALJ Thompson found based on the residual functional capacity, Mr. McCloskey "is unable to perform any past relevant work."[66] Relying on testimony from Vocational Expert Clifton King, ALJ Thompson at step five found Mr. McCloskey could still work three jobs in the national economy with his residual functional capacity: (1) dietary aide, (2) transporter, patient; and, (3) sandwich maker.[67] ALJ Thompson found Vocational Expert King's testimony consistent with the "Dictionary of Occupational Titles."[68] ALJ Thompson concluded Mr. McCloskey "has not been under a disability," as defined in the Act.[69]

## II. Analysis

Mr. McCloskey challenges the Commissioner's finding he is not disabled under the Act. McCloskey argues substantial evidence does not support ALJ Thompson's decision because he ignored (1) opinions from treating physicians concerning his epilepsy, (2) his history of seizures, and (3) testimony from Vocational Expert Clifton King in response to Mr. McCloskey's counsel's question.

"The Appeals Council's denial of Plaintiff's request for review means the ALJ's decision is the decision of the Commissioner."[70] The Appeals Council denied Mr. McCloskey's request for review on May 25, 2018.[71] We review ALJ Thompson's March 20, 2018 written decision.[72] We review ALJ Thompson's interpretation and application of the law de novo, but we review ALJ

8

Thompson's factual findings under the deferential "substantial evidence" standard.[73] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[74] Substantial evidence "is more than a mere scintilla," though the standard "requires less than a preponderance of the evidence."[75] Substantial evidence review means we "may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record."[76] It is therefore irrelevant whether "acting de novo, [we] would have decided the case differently."[77]

### A. ALJ Thompson did not ignore medical opinions of Mr. McCloskey's treating physicians.

Mr. McCloskey argues ALJ Thompson ignored "competent medical opinions of the claimant's treating physicians."[78] The Commissioner argues Mr. McCloskey fails to identify opinions ALJ Thompson ignored and, in fact, ALJ Thompson did not ignore opinions of the treating physicians.[79] We agree with the Commissioner.

Our Court of Appeals determined ALJs should accord reports of treating physicians great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."[80] An ALJ may not ignore treating physicians' reports and "may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided."[81]

ALJ Thompson considered the medical evidence from Mr. McCloskey's treating physicians. In determining Mr. McCloskey's residual functional capacity, ALJ Thompson considered the treating physicians' records and discussed the evidence in his decision. ALJ Thompson considered medical records from Crozier Chester Medical Center showing non-compliance with his medication regimen to treat his epilepsy.[82] ALJ Thompson considered Mr.

9

McCloskey's medical records from George W. Hill Correctional Facility. The records show Mr. McCloskey's seizures occurred "once in awhile," he failed to adhere to his medication regimen, and medical staff explained to him the importance of taking his medication.[83] ALJ Thompson also considered medical records from Dr. Bunt and Dr. Wilford showing Mr. McCloskey's seizures occur infrequently, his epilepsy responds to medication, and he fails to adhere to his medication regimen.[84]

Those records support ALJ Thompson's findings Mr. McCloskey suffers "some restrictions, but not the degree of limitation in work-related functioning alleged by the claimant."[85] While he testified his seizures occur "almost daily," medical evidence from treating physicians suggests otherwise. For example, in September 2014, he testified his last seizure occurred in 2013.[86] Medical evidence from treating physicians also supports ALJ Thompson's finding Mr. McCloskey fails to adhere to his medication regimen. Treating physicians from Crozier Medical and the George W. Hill medical staff noted his non-compliance with his regimen and explained to Mr. McCloskey the importance of taking his medication.[87] Several medical providers reported sub-therapeutic drug levels, indicating non-compliance with the medication.[88] An ALJ may rely on evidence showing non-compliance with a medication regimen in determining a claimant's residual functional capacity.

A case from our Court of Appeals is instructive. In *Facyson v. Banhart*, a claimant with epilepsy appealed the ALJ's decision denying supplemental social security benefits. The ALJ found, and the District Court affirmed, although the claimant's epilepsy caused some limitations, his residual functional capacity allowed him to perform jobs within the national economy.[89] The ALJ cited evidence showing (1) the claimant's "seizures were reasonably under control when he adhered to his medication regime" and (2) the claimant sometimes forgot to take his medication.[90]

10

Our Court of Appeals affirmed, despite existing evidence supporting a different decision—including testimony from a treating physician who opined the claimant's "occupational activities were severely limited and that he was disabled."[91]

Mr. McCloskey fails to identify treating physicians' opinions ALJ Thompson ignored. ALJ Thompson did consider the opinions of the treating physicians. Mr. McCloskey's argument fails.

### B. ALJ Thompson did not ignore Mr. McCloskey's history of seizures.

Mr. McCloskey argues ALJ Thompson "completely ignores the well detailed medical records of [Mr. McCloskey]'s history of seizures."[92] The Commissioner argues ALJ Thompson did not ignore his epilepsy but "identified [Mr. McCloskey]'s epilepsy as his sole severe impairment, acknowledging that it significantly limits his ability to perform basic work activities."[93] We agree with the Commissioner.

ALJ Thompson considered Mr. McCloskey's history of seizures. Mr. McCloskey argues ALJ Thompson ignored his history of seizures. We cannot agree. ALJ Thompson found Mr. McCloskey suffers from "severe" epilepsy causing him seizures.[94] ALJ Thompson acknowledged Mr. McCloskey's seizures can cause serious injuries.[95] But ALJ Thompson also found the medical evidence does not support Mr. McCloskey's testimony regarding the frequency of his seizures.[96] He also found evidence showing Mr. McCloskey's epilepsy responded to medication, but Mr. McCloskey failed to consistently adhere to his medication regimen. ALJ Thompson cites medical evidence in the record from a treating physician showing Mr. McCloskey "requested to be taken off seizure medication because he didn't think he needed to be on meds anymore."[97] Medical providers explained to Mr. McCloskey several times the importance of adhering to his medication regimen.[98] He also cites evidence from Dr. Wilford and Dr. Bunt showing Mr. McCloskey's

11

epilepsy improved when he took his medication.[99] Mr. McCloskey's argument ALJ Thompson ignored his history of seizures fails.

### C. ALJ Thompson did not err in failing to address Mr. McCloskey's counsel's hypothetical question for Vocational Expert King.

Mr. McCloskey argues ALJ Thompson ignored the vocational expert's response to his counsel's hypothetical question. ALJ Thompson formed a hypothetical based on Dr. Katherine Smith's opinion concerning Mr. McCloskey's limitations:

> "Let's begin with no exertional limitations. So the individual exertionally, hypothetically, can do everything at all exertional levels, that would include sedentary, light, medium, heavy, and very heavy. . . . We do have postural limitations, some are limited, some are not limited. The one that is limited concerns climbing ladders, ropes, and scaffolds. Never climb a ladder, rope, or scaffold. I want to repeat that. Never climb a ladder, rope, or scaffold. You may be wondering about the six remaining postures? Those are not limited. The individual can do those for all eight hours of the eight-hour work day, according to this doctor. So that would be unlimited climbing of ramps and stairs, unlimited balancing, unlimited stooping, unlimited kneeling, unlimited crouching, unlimited crawling. All six of those are not limited, can do those all eight hours of the eight-hour work day. . . .
>
> We do have environmental limitations. And there are several of them. Lucky for us, they're all under the same level of avoidance. It's avoid concentrated exposure, let me repeat that. Avoid concentrated exposure, and that's for several environmental matters. Avoid concentrated exposure to extreme cold, avoid concentrated exposure to wetness, avoid concentrated exposure to noise, avoid concentrated exposure to vibrations. . . . Avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation. . . . The final one, avoid concentrated exposure to hazards such as dangerous moving machinery and unprotected heights."[100]

In response to ALJ Thompson's hypothetical, Vocational Expert King offered three positions:

> I would offer the job of . . . [d]ietary aide, 319.677-014. It is medium, unskilled, SVP of 2. National numbers between 30 and 40,000. The job of transporter, patient. The DOT code is 399.677-014 and this is not driving a person, this is just within the hospital setting, medical center, medium, SVP of 2, unskilled. National numbers, no more than 10,000. . . . On the job of sandwich maker, 317.664-010. It is medium, unskilled, SVP of 2. . . . I got approximately 55,000.[101]

12

Mr. McCloskey's counsel cross examined Vocational Expert King: "And in taking into consideration his honor's hypothetical, did you take into consideration whether or not someone with a seizure disorder would be able to perform and of those occupations that identified?" Vocational Expert King answered "[i]n my opinion, no . . . [they] [w]ould not be able to."[102]

Mr. McCloskey argues ALJ Thompson did not consider Vocational Expert King's response someone with a "seizure disorder" could not perform the jobs identified in response to ALJ Thompson's hypothetical. The Commissioner argues ALJ Thompson properly disregarded Vocational Expert King's response because his counsel's reference to Mr. McCloskey's seizure disorder without identifying functional limitations is irrelevant.

An ALJ may rely on a vocational expert's testimony when determining whether the claimant can perform jobs in the national economy only if the ALJ "accurately convey[s] to the vocational expert all of a claimant's credibly established limitations."[103] While an ALJ "may not reject pertinent or probative evidence without explanation," an ALJ need not "cite all evidence a claimant presents, including evidence that is irrelevant to her case."[104]

ALJ Thompson incorporated Mr. McCloskey's residual functional capacity into the hypothetical he asked Vocational Expert King. In determining the residual functioning capacity, ALJ Thompson relied on Dr. Smith's assessment of Mr. McCloskey's medical records. Dr. Smith listed "epilepsy" as one of Mr. McCloskey's medically determinable impairments and noted the impairment is "severe."[105] But she found Mr. McCloskey's statements regarding his symptoms "partially credible."[106] Dr. Smith then listed Mr. McCloskey's functional limitations based on her review of the medical records and her assessment of Mr. McCloskey's credibility.[107] ALJ Thompson incorporated these limitations into the hypothetical he asked Vocational Expert King.

13

Although Mr. McCloskey argues ALJ Thompson failed to consider Vocational Expert King's response a person with a "seizure disorder" could not perform the jobs identified, ALJ Thompson's question already incorporated the limitations caused by Mr. McCloskey's seizure disorder. ALJ Thompson took the limitations from Dr. Smith's Determination Explanation, who considered Mr. McCloskey's seizure disorder and found it "severe." But she found Mr. McCloskey's statements regarding his symptoms as "partially credible." Dr. Smith reviewed Mr. McCloskey's medical records and determined Mr. McCloskey's functional limitations based on her review.

While ALJ Thompson did not include counsel's question and the answer in his decision, he need not include such when the question fails to identify the claimant's precise limitations.[108] Mr. McCloskey's counsel's general reference to Mr. McCloskey's "seizure disorder" without any indication of how the disorder affects his functioning is irrelevant.[109] Mr. McCloskey's argument ALJ Thompson improperly ignored the vocational expert's response to counsel's question fails.

## III. Conclusion

We do not engage in fact-finding or drawing inferences based on our view of the submitted evidence. Our role is to ensure ALJ Thompson fulfilled his obligations in the hearing and issued a decision based on substantial evidence. Based on this standard, we do not find error warranting reversal or remand. In an accompanying Order, we affirm the Commissioner's May 25, 2018 decision denying Mr. McCloskey's request for supplemental security income benefits and dismiss his present case.

---

[1] Administrative Record ("R. __") 112, ECF Doc. No. 6.

14

---

[2] R. 61.

[3] R. 59.

[4] *Id.*

[5] *Id.*

[6] R. 60.

[7] *Id.*

[8] R. 62.

[9] R. 63.

[10] R. 71.

[11] R. 61.

[12] R. 65.

[13] *Id.*

[14] R. 66.

[15] *Id.*

[16] R. 81.

[17] R. 81-83.

[18] R. 83.

[19] R. 68.

[20] R. 74.

[21] R. 74-75.

[22] R. 75.

[23] R. 76.

[24] R. 85-87.

[25] R. 87.

[26] R. 90.

[27] 42 U.S.C. § 423(d)(1)(A).

[28] *Kich v. Colvin*, 218 F. Supp. 3d 342, 352 (M.D. Pa. 2016).

[29] *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (internal quotation marks omitted).

[30] *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014).

[31] *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).

[32] *Bowen*, 482 U.S. at 141.

[33] *Id.*

[34] *Patel v. Colvin*, 214 F. Supp. 3d 383, 385 (E.D. Pa. 2016).

[35] *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012).

[36] *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).

[37] *Patel*, 214 F. Supp. 3d at 385.

[38] R. 14.

[39] *Id.* ALJ Thompson also concluded Mr. McCloskey has the following "non-severe impairments": alcohol abuse, tobacco abuse, residuals from a large facial ecchymosis where he struck his left eye, facial bone fractures, soft tissue swelling, migraine headaches, post-concussion syndrome, tinnitus, psoriasis, insomnia, arthritis, decreased hearing, decreased vision, and anxiety. ALJ Thompson concluded these "non-severe impairments can be managed medically and do not impose any limitations in the claimant's work related functioning."

[40] R. 15 (citing 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing 11.02 for "epilepsy")).

[41] R. 16.

[42] R. 17.

[43] *Id.*

[44] *Id.*

[45] R. 19.

⁴⁶ *Id.*

⁴⁷ *Id.*

⁴⁸ R. 17.

⁴⁹ *Id.*

⁵⁰ R. 16-19.

⁵¹ R. 333, 339.

⁵² R. 537.

⁵³ R. 526.

⁵⁴ R. 521.

⁵⁵ R. 509.

⁵⁶ R. 511.

⁵⁷ R. 503.

⁵⁸ R. 495.

⁵⁹ R. 491.

⁶⁰ R. 552.

⁶¹ *Id.*

⁶² R. 585.

⁶³ R. 580.

⁶⁴ R. 579.

⁶⁵ R. 568.

⁶⁶ R. 20.

⁶⁷ R. 21.

⁶⁸ *Id.*

[69] *Id.*

[70] *Witkowski v. Colvin*, 999 F. Supp. 2d 764, 772 (M.D. Pa. 2014).

[71] R. 1.

[72] *Witkowski*, 999 F. Supp. 2d at 772-73.

[73] *Bynum v. Colvin*, 198 F. Supp. 3d 434, 436 (E.D. Pa. 2016); *Witkowski*, 999 F. Supp. 2d at 772-73.

[74] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see Patel*, 214 F. Supp. at 384.

[75] *Patel*, 214 F. Supp. 3d at 384.

[76] *Bynum*, 198 F. Supp. 3d at 436.

[77] *Id.* at 436-37.

[78] ECF Doc. No. 8, at p. 2.

[79] ECF Doc. No. 11, at p. 6.

[80] *Plummer*, 186 F.3d at 429.

[81] *Id.*

[82] R. 333, 339.

[83] R. 509, 511, 521, 537.

[84] R. 552, 568, 579, 580, 585.

[85] R. 18.

[86] R. 503.

[87] R. 339, 511.

[88] *Phillips v. Comm'r of Soc. Sec.*, 276 F. App'x 219, 221 (3d Cir. 2008) ("[L]aboratory work showed serum levels [of Dilantin] in the sub-therapeutic range, indicating non-compliance with medication.").

[89] *Facyson v. Barnhart*, 94 F. App'x 110, 111 (3d Cir. 2004).

[90] *Id.* at 113.

[91] *Id.*

[92] ECF Doc. No. 8, at p. 3.

[93] ECF Doc. No. 11, at p. 6.

[94] R. 14.

[95] R. 17.

[96] R. 503 (medical record from September 2014, states his last seizure occurred in 2013).

[97] R. 16.

[98] R. 339, 511.

[99] R. 568 (generalized seizures "improved," and suggesting "increase keppra"); R. 579 (taking Keppra and "[e]pilepsy is getting better").

[100] R. 85-87.

[101] R. 87.

[102] R. 90.

[103] *Rutherford*, 399 F.3d at 554.

[104] *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008).

[105] R. 100.

[106] R. 101.

[107] *Id.*

[108] *Jones v. Sullivan*, 804 F. Supp. 1398, 1407 (D. Kan. 1992) ("Vocational testimony elicited by hypothetical questions that do not relate with precision the claimant's impairments does not constitute substantial evidence to support the Secretary's decision.").

[109] *Johnson*, 529 F.3d at 204; *see also Gann v. Berryhill*, 864 F.3d 947, 952 (8th Cir. 2017) (quoting *Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994)) ("Unless the hypothetical question comprehensively describes the limitations on a claimant's ability to function, a vocational expert will be unable to accurately assess whether jobs do exist for the claimant.").